# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

The location of the cellular telephones assigned call numbers **(414) 477-3294** with International Mobile Subscriber Identity (IMSI) number 310260515830054 (the "**Target Cell Phone 1**"), **(414) 301-0926** with IMSI number 310260799933797 (the "**Target Cell Phone 2**") and **(414) 629-0326** (the "**Target Cell Phone 3**") whose service provider is T-Mobile/Metro PCS, a wireless telephone service provider headquartered in Parsippany, New Jersey.

)
)
)
)
)
)
)

Case No. 18-M-84 (DEJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

location of the cellular telephones assigned to call numbers, more fully described in Attachment A.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
 ☒ evidence of a crime;
 ☒ contraband, fruits of crime, or other items illegally possessed;
 ☒ property designed for use, intended for use, or used in committing a crime;
 ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code 846, 841(a)(1) and 843(b) (conspiracy to distribute controlled substance and use of a communication facility to facilitate a drug-trafficking crime)

The application is based on these facts: See attached affidavit.

☒ Delayed notice of __30__ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Mark Wagner, WI Dept. of Justice, DCI
_____
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: May 25, 2018

City and State: Milwaukee, Wisconsin        Honorable David E. Jones, U.S. Magistrate Judge
_____
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Mark Wagner, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers **(414) 477-3294** with International Mobile Subscriber Identity (IMSI) number 310260515830054, (the **"Target Cell Phone 1" (TCP1)**), **(414) 301-0926** with IMSI number 310260799933797 (the **"Target Cell Phone 2" (TCP2)**), and **(414) 629-0326** (the **"Target Cell Phone 3" (TCP3)**), whose service provider is T-Mobile/Metro PCS, a wireless telephone service provider headquartered in Parsippany, New Jersey. **TCP1** is subscribed to "Paul Lavoe." **TCP2** is subscribed to an unknown pre-paid customer. **TCP3** has an unknown IMSI and is subscribed to "Ana Ayala Aviles." The **Target Cell Phones** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent with the Wisconsin Department of Justice - Division of Criminal Investigation (DCI), and have been since September, 2017. On May 22, 2018, I was deputized as a Task Force Officer with the United States Drug Enforcement Administration (DEA). Prior to my current assignment, I was employed as a Detective with the City of Milwaukee Police Department in Milwaukee, Wisconsin for twenty-five years. During the last 10 years of my previous employment, I was a Task Force Officer with the FBI assigned to the Wisconsin High Intensity Drug Trafficking Area (HIDTA) and the Joint Terrorism Task Force (JTTF). During my previous employment, I have been involved primarily in the investigation of

large scale narcotics traffickers operating not only in the City of Milwaukee and the State of Wisconsin, but also throughout the entire United States.

3. As a law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, and court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

2

5. Based upon my training and experience, as well as information relayed to me during the course of my official duties, I know that a significant percentage of narcotics, specifically marijuana, cocaine, heroin and methamphetamine, imported into the United States comes from Mexico and enters the domestic market at various points along the southwest border of the United States. Based on training and experience, I also know that a significant amount of cocaine, marijuana, heroin and methamphetamine enters the United States through Mexico, which controls the transportation and sale of cocaine, marijuana, heroin, and methamphetamine into the United States.

6. Additionally, I know that illegal narcotic sales in the United States generate billions of dollars annually, most of it in United States currency. Efforts to legitimize or "launder" this cash by the drug distributors are subject to detection because of intense scrutiny placed on large financial transactions by U.S. banks. To avoid detection, the cartels developed a number of money laundering systems to avoid financial transaction reporting requirements.

7. In addition, I have also learned narcotic traffickers routinely utilize narcotics proceeds to purchase assets, to include: real property and/or invest in legitimate business ventures. By doing so, narcotics proceeds are introduced into the financial system. The narcotics traffickers then utilize these assets to facilitate legitimate businesses designed to effectively launder drug proceeds. Once the assets are no longer needed, they are sold, potentially for a profit. Based on my training, experience, and conversations with other law enforcement officers, traffickers are also known to take narcotics proceeds and smuggle them back to the source of supply for the drugs through bulk currency transfers via vehicles or money orders.

3

8. Based on my experience in conducting criminal investigations of violations of the Controlled Substances Act, I know that "Drug Trafficking Organizations" (DTOs) have developed a number of methods to insulate their illegal activities from detection by law enforcement. These methods are common to major DTOs to varying degrees of sophistication.

9. Based on my training, experience, and conversations with other law enforcement officers, I know that distributors of marijuana, methamphetamine, cocaine, heroin, as well as other controlled substances, often utilize cellular and "hardline" telephones. Additionally, I know that drug dealers often change their phone numbers and cellular devices on a frequent basis in an attempt to thwart law enforcement from tracking their phones as well as a means to conceal their identities. Based on my training, experience, and conversations with other law enforcement officers, I know that these individuals often use code words to discuss controlled substances and methods of concealing controlled substances while talking on the telephone. Based on training, experience, and conversations with other law enforcement officers, I know that violators of the controlled substances law often conduct extensive counter-surveillance to avoid law enforcement detection.

10. Based upon training and experience, I know that narcotics-trafficking and money-laundering organizations routinely utilize several operational techniques to sustain their illegal enterprises. These practices are designed and implemented to achieve two paramount goals: (1) the successful facilitation of the organization's illegal activities, including the importation and distribution of controlled substances and the subsequent repatriation of the proceeds of that illegal activity; and (2) the minimization of the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement. More specifically, based on my training and experience, I assert the following:

a. The more entrenched and sophisticated drug-trafficking organizations routinely compartmentalize their illegal operations. The compartmentalization of operations reduces the amount of knowledge possessed by each member of the organization. This method of operation effectively minimizes the potential damage an individual cooperating with law enforcement could inflict on the organization and further reduces the adverse impact of a particular law enforcement action against the organization.

b. Members of these organizations routinely utilize communications facilities, i.e. cellular telephones, to communicate directions and information about the organization's illegal activities to other organization members.

c. During the course of these telephonic communications, organization members routinely use coded references and encryption in an effort to elude law enforcement detection.

d. The communication of time sensitive information is critical to the successful conduct of these organizations' illegal activities. The critical nature of this information stems from the necessity of the organization's management to provide direction for the importation and distribution of narcotics, as well as, the subsequent laundering of the proceeds of those illegal activities.

e. Narcotics traffickers, and money launderers associated with them, often confine their illegal telephonic communications to long-trusted organizational members and other high-level narcotics traffickers in an attempt to evade law enforcement and circumvent narcotics investigations; and

f. Narcotics traffickers routinely utilize fictitious names, or other individuals, in which to register pagers, telephones, vehicles, real property, and utility services in order to avoid detection by law enforcement.

11. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

12. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846, 841(a)(1), and 843(b) (conspiracy to distribute controlled substances (cocaine and heroin) and use of a communication facility to facilitate a drug-trafficking crime) are being committed, and will be committed by Paul LAVOE (Black male, DOB: 04/14/1977), Javier BERRIOS (Hispanic Male, DOB: 03/02/1976), Salvador VALDIVIA-JIMENEZ (Hispanic male, DOB: 07/10/1979), and other associates of their drug trafficking organization ("BERRIOS DTO") who have yet to be identified. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

13. In February 2018, Wisconsin Department of Justice - Division of Criminal Investigation (DCI), and members of the United States Drug Enforcement Administration - Milwaukee (DEA) initiated an investigation into individuals, later identified as being Paul LAVOE, Javier BERRIOS and Salvador VALDIVIA-JIMENEZ, who were distributing large quantities of heroin and cocaine, throughout Milwaukee, Wisconsin.

14. Case agents received information regarding the illegal drug trafficking activities of BERRIOS and LAVOE who distribute heroin and cocaine throughout the Milwaukee area from a confidential source (hereinafter "CS #1"). CS #1 has been providing reliable information to DCI since February, 2018. Specifically, CS #1 conducted multiple controlled purchases of cocaine and heroin from BERRIOS and LAVOE.

6

15. Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

16. CS #1 has provided information about the membership, structure, and customs of the BERRIOS DTO. CS #1 has positively identified BERRIOS and LAVOE, members of the BERRIOS DTO, through Wisconsin Department of Transportation photographs. CS #1 has conducted several, consensually-recorded conversations with BERRIOS and LAVOE, including audio and video recordings with LAVOE and BERRIOS, both in person and on the telephone during the course of this investigation. CS #1 has conducted controlled purchases of heroin and cocaine from BERRIOS and LAVOE. CS #1's information concerning the BERRIOS DTO has been corroborated by other confidential sources, specifically confidential source #2 ("CS #2), information obtained from various public databases, physical surveillance, and through controlled drug purchases, money deliveries and consensually-recorded conversations and phone calls that CS #1 had with BERRIOS and LAVOE. CS #1's information has never been found to be false or misleading.

7

17. CS #1 has a criminal history that includes arrests for Possession of a firearm by a felon, Possession with the Intent to Deliver Cocaine and Heroin, Possession of Marijuana and Cocaine, Bail Jumping, Theft, and Criminal Damage to Property. CS #1 is receiving consideration in connection with a pending drug case from the Milwaukee County District Attorney's office for his/her cooperation with law enforcement.

18. CS #1 was interviewed by investigators in February, 2018 and provided detailed information about the current and past drug-trafficking activities of Paul LAVOE and Javier BERRIOS. CS #1 has been purchasing up to four and a half ounces of cocaine, twice a week, from BERRIOS and LAVOE for the past year and a half. CS #1 explained he/she always has to call LAVOE at the **TCP1** and LAVOE will then call BERRIOS at **TCP2**. LAVOE contacts BERRIOS in order to arrange a meeting between CS #1 and BERRIOS at LAVOE'S business, PL Power Cycles, located at 1531 South 1st Street, Milwaukee, Wisconsin. BERRIOS will then meet CS #1 at LAVOE'S business and sell cocaine and/or heroin to CS #1. CS #1 has made four controlled buys of cocaine and heroin from Paul LAVOE and Javier BERRIOS, between February 14, 2018 and today's date. The information CS #1 provided has been corroborated by case agents through controlled purchases of cocaine and heroin. For the reasons stated in paragraphs 16 through 18, I consider CS #1 to be reliable.

19. In January, 2018, investigators interviewed CS #2 who stated they had previously met VALDIVIA-JIMENEZ through an associate, identified as Billy BAKER. CS #2 identified BAKER as an ounce-level cocaine distributor, who had a long-standing relationship with VALDIVIA-JIMENEZ. CS #2 further stated that VALDIVIA-JIMENEZ provided BAKER with quantities of cocaine. CS #2 provided BAKER's telephone number as (414) 702-7055. Investigators later conducted toll analysis of **TCP3**, which showed it to be in frequent contact

8

with BAKER. Investigators later obtained a state of Wisconsin GPS warrant for a vehicle operated by BAKER. During monitoring of the GPS, investigators frequently observed BAKER's vehicle arriving at 9200 West Morgan Avenue, Milwaukee, Wisconsin, where it remained for short periods of time. Based on their training and experience, investigators believe that BAKER's short stops at VALIDIVIA-JIMENEZ's residence, indicate the two parties are conducting drug/money transactions while at the residence.

20. On February 15, 2017, Milwaukee DEA case agents executed a federal search warrant at a Milwaukee residence, utilized by a cocaine distributor identified as Marcelino MENDEZ. Investigators seized approximately three (3) kilograms of cocaine, multiple firearms, and bulk U.S. Currency from inside the residence. MENDEZ was subsequently arrested, and during a post-arrest interview, admitted that he (MENDEZ) owed his cocaine source of supply ("SOS") for the three (3) kilograms of cocaine.

21. Approximately one week later, investigators spoke to CS #2, who advised he/she was contacted by a Hispanic male subject regarding a drug debt owed by MENDEZ. The Hispanic male subject asked CS #2 if he/she owed MENDEZ any money for cocaine previously supplied by MENDEZ. CS #2 denied owing any money to MENDEZ. CS #2 provided investigators with a description of the Hispanic male subject, including his vehicle. Investigators later showed CS #2 a Wisconsin Department of Transportation photograph of VALDIVIA-JIMENEZ, which CS #2 positively identified as the Hispanic male subject attempting to collect a drug debt.

22. CS #2 also identified BERRIOS by a Wisconsin Department of Transportation photograph. CS #2 is aware BERRIOS is a distributor of heroin and cocaine throughout the City

9

of Milwaukee. CS #2 believes VALDIVIA-JIMENEZ supplies cocaine to BERRIOS for distribution, but does not know BERRIOS' source of supply of heroin.

23. CS #2 has a criminal history that includes arrests for Domestic Violecne-Disorderly Conduct. CS #2 provided information against his/her penal interest and the information was coorberatied by law enforcement officers through public data bases and law enforcement reports. CS #2 has also provided information which has been indepentendly verified through information provided by CS #1.

24. For the reasons stated in paragraphs 19 through 23, the affiant considers CS #2 to be reliable.

25. On February 14, 2018, CS #1 made a controlled purchase of one ounce of cocaine from Paul LAVOE and Javier BERRIOS. CS #1 contacted Paul LAVOE at **TCP1**. CS #1 explained to LAVOE that he/she wanted to "holler at Jay." LAVOE asked CS #1 if he, LAVOE, was going to get a "percentage" this time. CS #1 informed LAVOE that he/she would talk to him about it when they met. LAVOE told CS #1 to come down to the shop. Approximately an hour after CS #1 arrived at LAVOE'S business, BERRIOS arrived, and BERRIOS sold CS #1 an ounce of cocaine for $1,100.00.

26. On February 25, 2018, case agents received a subpoena return of toll records for the call number associated with **TCP1** for the time period of the controlled buy on February 14, 2018. Case agents analyzed the toll records which revealed the following:

- 09:11:29, LAVOE (**TCP1**) received an incoming call from CS #1 (1minute 1second).

- 09:13:11, LAVOE (**TCP1**) made an outgoing call to 414-301-0926 (**TCP2**) (BERRIOS) (1minute 35seconds).

- 09:15:15, LAVOE (**TCP1**) made an outgoing call to CS-1 (29 seconds).

10

- 10:22:05, LAVOE (**TCP1**) made an outgoing call to CS-1 (16 seconds).

- 10:22:39, LAVOE (**TCP1**) made an outgoing call to BERRIOS (**TCP2**) (42 Seconds).

- 10:47:49, LAVOE (**TCP1**) received and incoming call from CI-2839 (0 seconds).

- 11:03:05, LAVOE (**TCP1**) made an outgoing call to BERRIOS (**TCP2**) (21 Seconds).

- 11:32:06, LAVOE (**TCP1**) made an outgoing call to BERRIOS (**TCP2**) for 5 seconds.

27. Case agents are aware the toll records directly reflect the times of recorded calls made by CS #1 to LAVOE (**TCP1**) and the calls with LAVOE (**TCP1**) to BERRIOS (**TCP2**) on February 14, 2018. Case agents also learned through public database searches that the telephone number 414-301-0926 (**TCP2**) is associated with the Facebook page of "J's Garage." Case agents are aware through public databases, the registered agent of "J's Garage" is Javier BERRIOS.

28. On March 1, 2018, CS #1 made a controlled buy of cocaine from BERRIOS and LAVOE. CS #1 called LAVOE (**TCP1**) and CS #1 told LAVOE that he/she needed to talk to "Jay" (BERRIOS). LAVOE told CS #1 to meet him at his business (PL Power Cycles). Berrios arrived at Lavoe's business approximately an hour and a half after CS #1 arrived and sold CS #1 an ounce of cocaine for $1,100.00.

29. On March 27, 2018, CS #1 made a controlled buy of cocaine and heroin from BERRIOS and LAVOE. CS #1 called LAVOE (**TCP1**) and CS #1 asked LAVOE if he/she could meet at LAVOE'S business. After arriving CS #1 informed LAVOE that he/she needed to two

11

(2) ounces of cocaine and ten (10) grams of heroin. LAVOE (**TCP1**) then called BERRIOS (**TCP2**) and stated "Mr. President., Mr. President, your son is hungry." LAVOE then tried to explain to BERRIOS what CS #1 wanted and stated "two and three, two and four". CS #1 told LAVOE "two and ten" and LAVOE repeated "two and ten." After approximately 30 minutes, BERRIOS arrived at LAVOE'S business and asked CS #1 what they wanted. CS #1 informed BERRIOS that he/she wanted two (2) ounces of cocaine and ten (10) grams of heroin. BERRIOS left the business and surveillance followed BERRIOS to 191 South 2nd Street, Milwaukee, Wisconsin, which is believed to be BERRIOS "stash house." BERRIOS entered the location for a short period of time and returned to LAVOE'S business. After returning, BERRIOS sold CS #1 two (2) ounces of cocaine and ten (10) grams of heroin for a total of $3,000.00.

30. Case agents conducted physical surveillance on BERRIOS before he arrived at LAVOE'S business on March 27, 2018. BERRIOS was observed leaving his business, "J's garage," located at 7520 West Stevenson, Milwaukee, Wisconsin and driving to 9200 West Morgan Avenue, Milwaukee, Wisconsin. BERRIOS met with a subject later identified as Salvador VALDIVIA-JIMENEZ, who is believed to utilize the telephone number 414-629-0326 (**TCP3**). The surveillance team observed VALDIVIA-JIMENEZ follow BERRIOS in separate vehicles. The targets exited and re-entered the freeway; pulled over and stopped for short periods of time, and adjusted their speeds to under the speed limit and then accelerated to over the speed limit. They traveled to 191 South 2nd Street, where both BERRIOS and VALDIVIA-JIMENEZ entered the building. Both JIMENEZ and BERRIOS then exited 191 South 2nd Street. The surveillance team followed BERRIOS to LAVOE'S business to meet with CS #1 and VALDIVIA-JIMENEZ left in a different direction.

12

31. Through telephone toll analysis, investigators learned that VALDIVIA-JIMENEZ (**TCP3**), and BERRIOS (**TCP2**) are in frequent contact, and believed to be involved in a poly-drug (BERRIOS-heroin and VALDIVIA-JIMENEZ-cocaine) distribution association.

32. While conducting surveillance of 9200 West Morgan Avenue, Milwaukee, Wisconsin, investigators identified several vehicles, including a white 2008 Cadillac CTS, sedan, bearing Wisconsin license 654-YMN. According to Wisconin Department of Transportation (WIDOT) records, the Cadillac was registered to Salvador VALIVIA-JIMENEZ with a listed address of 9200 West Morgan Avenue, Milwaukee, Wisconsin.

33. Investigators discovered a City of Milwaukee Police Department incident report from September 13, 2017 (IR17-256-0138). The theft from vehicle report lists the victim as Maria ACOSTA-VALDIVIA with a date of birth of 07-10-1979 and address of 9200 West Morgan Avenue, Milwaukee, Wisconsin. The victim's primary cell phone number is (414) 403-0304 and **TCP3** is the listed secondary contact number. Additionally, the reported theft occurred from a white 2008 Cadillac CTS, which is registered to VALDIVIA-JIMENEZ.

34. Based on public records and law enforcement datatbases, investigators learned that ACOSTA-VALDIVIA's date of birth is 05-03-1976. Investigators also learned that VALDIVIA-JIMENEZ's date of birth is 07-10-1979. Investigators believe ACOSTA-VALDIVIA presented VALDIVA-JIMENEZ's date of birth as her own when filing said police report.

35. On April 10, 2018, investigators conducted surveillance of 9200 West Morgan Avenue. While in the immediate area, at approximately 3:59 p.m., investigators observed BERRIOS' previously identified white Land Rover pull into the adjacent parking lot of the apartment complex. Approximatley 1 minute later, investigators observed VALDIVIA-JIMENEZ exit his residence, enter a gray Cadillac coupe registered to VALDIVIA-JIMENEZ, and depart the

13

area. The Land Rover and Cadillac traveled in tandem to 191 South 2nd Street, Milwaukee, Wisconsin (BERRIOS "stash house"). Investigators observed both BERRIOS, and VALDIVIA-JIMENEZ enter the main entrance to the residence. At approximately 4:30 p.m., VALDIVIA-JIMENEZ departed from the residence in the gray Cadillac.

36. Investigators later conducted toll analysis between (**TCP2**) and (**TCP3**) for April 10, 2018. At approximately 2:49 p.m. (**TCP3**) contacted (**TCP2**). Over the next hour, (**TCP2**) and (**TCP3**) were in contact an additional 2 times, with the last contact occurring at 3:58 p.m., right before investigators observed BERRIOS arrive at VALDIVIA-JIMENEZ's residence.

37. On May 03, 2018, CS #1 made a controlled purchase of two (2) ounces of cocaine and twenty (20) grams of heroin from LAVOE and BERRIOS. CS #1 contacted LAVOE at (**TCP1**) and LAVOE then contacted BERRIOS at (**TCP2**). BERRIOS arrived at LAVOE'S business and asked CS #1 what he/she needed. CS #1 told BERRIOS he/she wanted two (2) ounces of cocaine and twenty (20) grams of heroin. BERRIOS left LAVOE'S business and case agents surveilled him to 191 South 2nd Street. BERRIOS entered the building and exited a short time later. BERRIOS returned to LAVOE'S business and sold CS #1 two ounces of cocaine and twenty grams of heroin for a total of $3,800.00.

38. The affiant is trained and experienced in the administration of the Nark II, 07 Field Test; which tests for the presence of cocaine and cocaine base. The affiant is also trained and experienced in the administration of the Nark II, 11 Field Test; which tests for the presence of heroin. The affiant has used both field tests in the past and found them to be reliable; the affiant subjected samples of the substances purchased from the confidential source in aforementioned paragraphs (25, 28, 29, and 37) and that the results of the field tests were consistent with the presence of cocaine and heroin, respectively.

14

39. Case agents with DCI, DEA and Department of Homeland Security – Homeland Security Investigations (HSI) are investigating Javier BERRIOS, Paul LAVOE and Salvador VALDIVIA-JIMENEZ for conspiracy to distribute cocaine and heroin. The investigation to date has included traditional law enforcement methods, including, but not limited to: controlled buys, interviews with confidential sources and sources of information; information from other law enforcement officers; documentary evidence; pen register, trap and trace, and telephone toll data; recorded telephone calls with targets, and physical surveillance.

40. In my training and experience, I have learned that T-Mobile/Metro PCS is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

41. Based on my training and experience, I know that T-Mobile/Metro PCS can collect E-911 Phase II data about the location of **TCP1, TCP2 and TCP3**, including by initiating a signal to determine the location of **TCP1, TCP2 and TCP3** on T-Mobile/Metro PCS's network or with such other reference points as may be reasonably available.

42. Based on my training and experience, I know that T-Mobile/Metro PCS can collect cell-site data about the Target Cell Phone

## AUTHORIZATION REQUEST

43. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

44. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

45. I further request that the Court direct T-Mobile/Metro PCS to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile/Metro PCS for a time period of 45 days from the date the warrant is signed. I also request that the Court direct T-Mobile/Metro PCS to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile/Metro PCS's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile/Metro PCS's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile/Metro PCS for reasonable expenses incurred in furnishing such facilities or assistance.

46. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephones assigned call numbers **(414) 477-3294** with International Mobile Subscriber Identity (IMSI) / Mobile Equipment Identifier number 310260515830054, (the **"Target Cell Phone 1" (TCP1)**), **(414) 301-0926** with IMSI / Mobile Equipment Identifier number 310260799933797 (the **"Target Cell Phone 2" (TCP2)**), and **(414) 629-0326** with unknown IMSI / Mobile Equipment Identifier number (the **"Target Cell Phone 3" (TCP3)**), whose wireless service provider is T-Mobile/Metro PCS, a company headquartered at 4 Sylvan Way; Parsippany, New Jersey 07054.

2. Information about the location of the **Target Cell Phones (TCP1, TCP2, and TCP3)** that is within the possession, custody, or control of T-Mobile/Metro PCS if needed: including information about the location of the **target telephones (TCP1, TCP2, and TCP3)** if the telephone and/or telephones is and/or are subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **Target Cell Phones (TCP1, TCP2, and TCP3)** described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phones" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile/Metro PCS, T-Mobile/Metro PCS is required to disclose the Location Information to the government. In addition, T-Mobile/Metro PCS must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile/Metro PCS's services, including by initiating a signal to determine the location of the **Target Cell Phones** on T-Mobile/Metro PCS's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile/Metro PCS for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).